IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-00491-PAB-MEH

AMY BULLOCK, as an individual, as the next of kin and personal representative of
JEFFREY BULLOCK, deceased, and as parent and next friend of
ADAM BULLOCK,
CHELSEA BULLOCK, and
MELISSA BULLOCK,

    Plaintiffs,

v.

DAIMLER TRUCKS NORTH AMERICA, LLC, a limited liability company
(formerly Freightliner, LLC); and
PENSKE TRUCK LEASING COMPANY, L.P., a limited partnership,

    Defendants.
_____

**ORDER**
_____

This product liability action is before the Court on defendant Penske Truck Leasing Company's Motion for Summary Judgment [Docket No. 140]. The Court has jurisdiction over this state law case pursuant to 28 U.S.C. § 1332. For the following reasons, the motion is granted.

**I. BACKGROUND**

This case arises from the death of Jeffrey Bullock, who was killed when he was allegedly ejected from the sleeper compartment of a tractor trailer in a rollover crash. That tractor trailer was built by defendant Daimler Trucks North America, LLC ("Daimler"), and was owned by defendant Penske Truck Leasing Company ("Penske"). At the time of the accident, the tractor trailer had been leased by Penske to Mr.

Bullock's employer, Domino's Pizza, and was being driven by Mr. Bullock and another Domino's employee. Plaintiffs' theory is that Mr. Bullock's death resulted from defects in the tractor trailer and, specifically, defects in the sleeper compartment in which Mr. Bullock was riding. Penske's motion for summary judgment rests on a simple and discrete premise: that it is not a "manufacturer" under Colorado's Product Liability Act and thus cannot be held liable in this lawsuit. The motion is fully briefed and ripe for decision.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id.*

## III. ANALYSIS

Plaintiffs assert two product liability claims – one for negligence and one for strict liability – against Penske. Compl. at 6-8. Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332. Both sides assume that Colorado law applies to plaintiffs' claims, and therefore I will as well. *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

Colorado's Product Liability Act provides that "[n]o product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product or the manufacturer of the part thereof giving rise to the product liability action." Colo. Rev. Stat. § 13-21-402(1). This "innocent seller" provision shields a defendant that has done nothing more than sell a defective product. On the other hand, as discussed below, the definition of "manufacturer" is expansive and is intended "to extend liability to those entities involved in the production of the product or otherwise in control [of] the production process." *Yoder v. Honeywell*, 900 F. Supp. 240, 246 (D. Colo. 1995).

Penske claims the protections of this innocent seller provision, arguing that it was simply a "purchasing intermediary" between the manufacturer of the tractor trailer in question and its customer. Mot. for Summ. J. [Docket No. 140] at 11. Plaintiffs disagree. In addition to contesting Penske's claim that Penske does not meet the statute's definition of a manufacturer, Pls.' Resp. [Docket No. 146] at 13-17, plaintiffs argue that the innocent seller provision does not apply at all, at least to their negligence

cause of action, *id.* at 17-20. I first consider this threshold issue of the provision's applicability to this case.

Citing to the Colorado Court of Appeals' decision in *Wallman v. Kelley*, 976 P.2d 330 (Colo. App. 1998), plaintiffs argue that the innocent seller provision does not bar a claim for negligence. While this accurately captures *Wallman*'s holding, it ignores its reasoning. The *Wallman* court interpreted a previous version of the innocent seller provision, which stated that "'[n]o product liability action *based on the doctrine of strict liability in tort* shall be commenced or maintained against any seller . . . .'" 976 P.2d at 333 (quoting Colo. Rev. Stat. § 13-21-402 (1997)) (emphasis added). Because "[n]egligence is not the logical equivalent of strict liability," the *Wallman* court found the negligence claim to fall outside of the statute. *Id.* ("[B]y their express terms, the provisions of the statute prohibiting claims against sellers who are not also manufacturers are limited to actions based on the doctrine of strict liability in tort. By the terms of the statute, it does not bar any other theories of action against sellers.").

In 2003, the Colorado legislature amended the innocent seller provision, expressly removing the language that actions must be grounded in a strict liability theory for the provision to apply. With the critical, limiting clause removed, *Wallman*'s reasoning does not apply here. Nothing in the current statute suggests that product liability actions based in negligence fall outside of the provision's explicit admonition that "*[n]o product liability action*" may be brought against a mere seller. Colo. Rev. Stat. § 13-21-402(1); *see also* CJI-Civ Ch. 14, Introductory Note ¶ 5 ("The limitation in § 13-21-402(1) . . . was broadened by the legislature in 2003, when the provision was

amended to preclude any product liability action, regardless of the theory, against a product seller unless that seller is also the manufacturer of the product or component part that is the subject of the action."). Plaintiffs' negligence claim falls within the innocent seller provision. As a result, I must next consider the key question – whether Penske is a "manufacturer" for the purposes of the statute.

The Product Liability Act provides a broad definition of the term "manufacturer." As is relevant here, a manufacturer includes "[1] any seller who has actual knowledge of a defect in a product or [2] a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or [3] who otherwise exercises some significant control over all or a portion of the manufacturing process." Colo. Rev. Stat. § 13-21-401(1). Plaintiffs claim that there is at least a triable issue as to whether Penske qualifies under each of these tests. Pls.' Resp. at 13-14. I disagree.

Plaintiffs first argue that there is evidence that Penske had actual knowledge of the defect in the tractor trailer. Specifically, plaintiffs argue that a jury could conclude that Penske had knowledge of the danger rollover accidents can pose to passengers in large trucks. *Id.* at 14. In its briefing, however, plaintiffs cite to little, if any, evidence that Penske actually had such knowledge. A party opposing summary judgment "may not rely merely on the unsupported or conclusory allegations contained in pleadings," but "must respond with specific facts demonstrating genuine issues requiring resolution at trial." *Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988). This evidentiary deficiency, alone, would likely justify rejection of this claim. But even assuming that plaintiffs' assertion is correct, generic knowledge of rollover danger is quantitatively

5

different than knowledge of the specific alleged defect – that the sleeper compartment was not crashworthy and the sleeper door would fail in a rollover crash. With absolutely no evidence that Penske had *that* knowledge, no reasonable jury could find that it meets the "actual knowledge" standard of the statute.

Plaintiffs next claim that Penske furnished Daimler with specifications relevant to the alleged defect in the tractor trailer. Pl.'s Resp. at 14-15. Plaintiffs point to evidence that Penske required its customers to select certain features, such as the tent-style restraint system in use in the tractor trailer in which Mr. Bullock was riding, and specifically note that the purportedly problematic sleeper cab access door was an option Penske made available to its customers. *Id.* at 14-16; *see also id.* at 2-6 ¶¶ 20-22. However, these "specifications" were not created by Penske. *See* Mot. for Summ. J. at 6-7 ¶¶ 20-28. The tent-style restraint system was the only restraint Daimler made available when Penske ordered the tractor trailer at issue in this case. *Id.*, Ex. A-3 at 122:12-15. Further, plaintiffs concede that Penske requested Daimler include the relevant sleeper cab access door "at the behest of" Penske's customer, Domino's. Pls.' Resp. at 15. Noticeably lacking from plaintiffs' evidence is any suggestion that Penske provided specifications *in the design or manufacturing sense*, i.e., provided Daimler the measurements, material, or method for constructing the tractor trailer at issue.

Plaintiffs' argument boils down to a claim that Penske passed along the options selected by its customers to Daimler. In the context of the Product Liability Act, "creat[ing] and furnish[ing] a manufacturer with specifications relevant to the alleged defect," Colo. Rev. Stat. § 13-21-401(1), must mean something more than that.

6

Otherwise, a seller intermediary who identifies an available option on behalf of its customer would be liable under the statute in the event that option turns out to be defective. Such a rule would eviscerate the Act's "innocent seller" protection of companies who merely sell a defective product. No reasonable jury could conclude that Penske "create[d] and furnishe[d]" specifications – as those terms are used in the Act – related to the allegedly defective components of the tractor trailer.

Finally, plaintiffs argue that Penske exercised "significant control" over the manufacturing process. Plaintiffs' basic contention is that Penske exercised this control by requesting that Daimler include the sleeper cab access door on the tractor trailer in question. Pls.' Resp. at 15 ("The significant control exercised by Penske was not on some insignificant part of the tractor, the significant control exercised by Penske resulted in this tractor-trailer being built with a sleeper access door."). As already discussed, however, this access door was expressly requested by Domino's. Penske was not controlling the manufacturing process when it merely selected an option on behalf of its customer. Plaintiffs' remaining evidence that Penske controlled the manufacturing process consists of testimony that Penske would internally discuss concerns about Daimler's new truck lines and communicate those concerns to Daimler and that, similarly, Daimler would involve large customers like Penske early on in the vehicle design process and would seek input from those customers on features they might want to see in a new vehicle model. Pls.' Resp. at 2-5 ¶ 20. But this evidence – that general concerns and desires were shared between manufacturer and customer – does not rise to the level of showing that Penske had the sort of control over Daimler's truck design and manufacturing process so as to make Penske itself liable as a

7

manufacturer of the tractor trailer in question. On this record, no reasonable jury could find that Penske exercised "significant control" over Daimler's manufacturing process.

## IV. CONCLUSION

Even viewed in plaintiffs' favor, the evidence in this case shows that Penske did little more than communicate its customer's truck order to Daimler. As a result, Penske is not a "manufacturer" for the purposes of the Colorado Product Liability Act and is therefore shielded from liability by the Act's innocent seller provision. Accordingly, it is

**ORDERED** that defendant Penske Truck Leasing Company's Motion for Summary Judgment [Docket No. 140] is GRANTED. All claims against defendant Penske Truck Leasing Company are dismissed.

DATED March 30, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge